IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ENRIQUE GUZMAN-RUIZ,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE<br><br><br>Case No. 2:05-CR-845 TS |

This matter comes before the Court on Defendant's Motion to Suppress Evidence.[1] Defendant filed the Motion on January 12, 2006. The Court held an evidentiary hearing on the Motion on February 24, 2006, and Defendant filed his Memorandum in Support of his Motion to Suppress on May 2, 2006.[2] The government filed its response on May 16, 2006.[3] Defendant

---

[1]Docket No. 11.

[2]Docket No. 20.  Defendant's Memorandum is docketed as a Motion to Suppress, but is actually a combined Motion and Memorandum.

[3]Docket No. 21.

1

filed a reply brief on June 16, 2006.[4]  This matter is now ready for decision by the Court.  For the reasons discussed below, the Court will deny the Motion to Suppress.

## I.  FACTUAL BACKGROUND

On October 25, 2005, at approximately 10:30 a.m., Defendant was stopped near mile marker 221 on Interstate 15, south of Nephi, Utah.  Defendant was stopped by now-retired Utah Highway Patrol Sgt. Mangelson (hereinafter "Sgt. Mangelson" or "the officer").  Sgt. Mangelson, before retiring, was a 39-year veteran of the Highway Patrol.  Sgt. Mangelson testified that he has spent most of that time interdicting narcotics.  Sgt. Mangelson had attended various drug interdiction training and had himself conducted training.  Sgt. Mangelson testified that he had conducted thousands of drug interdiction stops in his career.

On October 25, 2005, Sgt. Mangelson observed Defendant's vehicle.  He noticed that there was a strip of dark tinting on the windshield.  The dark strip across the windshield appeared to be below the AS-1 line, in violation of Utah law.  The side windows were also tinted darker than is allowed under Utah law.  When Sgt. Mangelson observed this, he activated his front emergency lights and his dashboard camera, and pulled the vehicle over.

After the vehicle had pulled to the side of the road, Sgt. Mangelson approached the vehicle from the passenger side.  Two occupants were in the car.  When the officer approached, the passenger opened the door, rather than rolling down the window.  Sgt. Mangelson testified that he had encountered situations where drugs were hidden in vehicle doors, thus making the window inoperable.

---

[4]Docket No. 26.

Sgt. Mangelson asked the driver of the car, the Defendant here, for a driver's license and registration.  Sgt. Mangelson testified that Defendant responded by giving him an Arizona I.D. card.  Sgt. Mangelson told Defendant that the card was only an I.D. card and asked for an operator's license.  Defendant responded by stating that he had a Mexican license.  Defendant provided Sgt. Mangelson with the Mexican license and the registration of the vehicle.

Sgt. Mangelson testified that if Defendant had a visa, Defendant's Mexican license would have been honored.  Defendant did not provide Sgt. Mangelson with a visa.  As a result, Defendant did not have a valid operator's license.  Sgt. Mangelson testified that without a valid operator's license between either the driver or the passenger,[5] the individuals would not have been able to drive the vehicle.  Sgt. Mangelson testified that the driver and the passenger would have been taken to jail and the vehicle would be impounded and subjected to an inventory search.

Sgt. Mangelson testified that during the stop, Defendant acted very nervous.  He stated that the Defendant was more nervous than most people during a stop.  Sgt. Mangelson testified that Defendant's hand was trembling very noticeably when he handed the officer the license and registration.  Sgt. Mangelson also testified that the passenger acted extremely scared and extremely nervous.

While the officer was conducting the stop, a number of items in the vehicle caught his attention.  The officer noticed a couple of Mexican-style blankets.  Sgt. Mangelson testified that he had seen drugs folded up in these types of blankets on several occasions.  He noticed a book or a small pamphlet with a picture of Jesus on it and a key chain with a picture of Jesus on it.

---

[5]The passenger in this case did not have a valid operator's license either.

3

The officer testified that, based on his experience, he had seen similar items and that they had been used on previous occasions as a "disclaimer."[6]  The officer also noticed fast food wrappers, which gave the vehicle the appearance of a "lived in" look.  Sgt. Mangelson also noticed a cell phone and a small screw driver.  Sgt. Mangelson testified that these are things that he had commonly seen in vehicles where drugs are prevalent and where drugs are being smuggled.

Sgt. Mangelson then asked the driver: "Nothing illegal in the car?"  The driver responded: "Nothing what?"  Sgt. Mangelson then used some of the few Spanish words that he knew and asked "No drogas?"  To which the driver responded "No."  The officer asked "No pistolas?"  The driver stated "Pistolas, no."  At this point, the officer stated "Can I, can I search?"  To which Defendant responded by saying "Sure."  The officer said "La cajuela?"[7] and pointed to the trunk.  On the video tape recording, the driver can be heard to say "Yeah."  Defendant testified that he believed the officer was ordering him to open the trunk and that he could not refuse.

At that point, the driver got out of the car and opened the trunk for Sgt. Mangelson.  The officer did not find anything illegal in his search of the trunk.  Sgt. Mangelson next searched the interior of the vehicle.  There is no indication that the officer sought further permission to search the passenger compartment of the vehicle.  There is also no indication that Defendant attempted to withdraw consent or in any way prevent Sgt. Mangelson from searching the other parts of the vehicle.

---

[6]The officer testified that he has seen such items being used to tell the police officer that the driver is involved in something ecclesiastic and is meant to dispel any suspicion of smuggling activities.

[7]The word "cajuela" means "trunk" in Spanish.

The officer then proceeded to the front of the car.  The officer attempted to open the hood, but could not get it to open.  At that point, Defendant opened the hood for the officer, without any prompting.  When the hood was opened, Defendant grabbed a role of black electrical tape from under the hood and tossed it in the corner of the vehicle.  Sgt. Mangelson testified that he had seen this type of tape used to wrap drugs and to wrap wiring, including wiring involved with solenoids.  The driver indicated that the tape was being used around the distributor area.  The officer testified that he did not see that any tape had been used in the area near the distributor.

While examining the area under the hood, Sgt. Mangelson testified that he noticed a fresh weld on the firewall separating the engine compartment from the passenger compartment on the passenger side of the car.  The officer testified that the welding had been done on the opposite side of the firewall, in the passenger compartment.  The officer testified that he could discern this from the look of the weld.  The officer testified that the weld was in the area of the passenger side air bag.  The officer also testified that he could see no reason for any welding to be done in that area.

Sgt. Mangelson returned to the interior of the vehicle and began to concentrate on the air bag compartment on the passenger side of the vehicle.  The officer first used his pocket knife to peer into the air bag compartment.  At that point, Defendant approached the officer in the car and told him twice "You don't find nada."  Then, the officer returned to his patrol car and retrieved a flashlight and a screwdriver and went back to the vehicle.  Sgt. Mangelson testified that, at this point, the driver and the passenger appeared more concerned and were obviously nervous.

Next, Sgt. Mangelson attempted to turn on the ignition in order to see if the air bag light would come on. The officer could not turn on the ignition and the driver again came to assist the officer. When the ignition was turned on, Sgt. Mangelson testified that the air bag light did not come on. The officer testified that this may have meant that alterations were made to the air bag compartment.

Sgt. Mangelson used a screwdriver to pry open the air bag compartment slightly so that he could see inside. He testified that he could see that there was an item inside that should not have been there and that was not the air bag. He testified that it looked like a white container with a lid of a different color. The officer testified that he had previous experience with hidden compartments and that every hidden compartment that he had encountered contained contraband.

At this point, Sgt. Mangelson testified that he believed that the driver and the passenger would either jump him or run away. As a result, he returned to his patrol car and called for back-up. Back-up officers arrived soon after. When back-up arrived, the officers arrested Defendant and the passenger and, later, they were advised of their *Miranda* rights in both English and Spanish.

The officers continued to search the air bag area, trying to find the combination to release the solenoid. Sgt. Mangelson testified that when the rear defrosters were turned on and the windshield wipers were turned on, magnets—which were found in plain view on the console—could be rubbed over the area by the speedometer to release the solenoid. At that point the air bag compartment opened. A search of the compartment uncovered a plastic container. The container held one pound of white material, which turned out to be MSM, a cutting agent for

methamphetamine. There were also two packages—one pound each—of a material, later determined to be methamphetamine, wrapped in black electrical tape. In addition, the officers found a package of plastic baggies in the car and $729 was taken from Defendant and $523 was taken from the passenger.

## II. DISCUSSION

Before discussing what is at issue in this Motion to Suppress, the Court finds it necessary to set forth what is not disputed. Defendant concedes the following issues. First, Defendant concedes that the initial stop of the vehicle by Sgt. Mangelson was lawful.[8] Second, Defendant concedes that the search of the trunk was lawful.[9] As a result of these concessions, the only issues before the Court are: (1) whether the search of the remainder of the car was lawful, either as a result of consent or probable cause; and (2) whether, if the search was unlawful, the evidence is nonetheless admissible under the inevitable discovery doctrine. Because the Court finds that Defendant consented to the search of the vehicle and that the officer had probable cause to search the air bag compartment of the vehicle, the Court will not address the inevitable discovery doctrine.

---

[8] Docket No. 11, at 1–2.

[9] *Id.* at 2.

A.      WHETHER THE SEARCH WAS LAWFUL

   1.      CONSENT

Under the Fourth Amendment, a search conducted without a warrant is per se unreasonable, subject only to a few specifically established and well-delineated exceptions.[10] One of those well-delineated exceptions is a search conducted pursuant to consent.[11] "Before a district court may admit evidence resulting from a consent search, it must determine from the totality of the circumstances that (1) the defendant's consent was voluntary and (2) the search did not exceed the scope of the consent."[12]

   a.      VOLUNTARINESS

"Valid consent is that which is freely and voluntarily given."[13]  "Whether a defendant freely and voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances."[14]  The government has the burden of showing that the consent was valid.[15]  "First, it must present 'clear and positive testimony that consent was unequivocal

---

[10]*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[11]*Id*.

[12]*United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th Cir. 1998).

[13]*United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal quotation marks and citations omitted).

[14]*Id*.

[15]*Id*.

8

and specific and freely and intelligently given.'"[16]  "Second, the government must show that the police did not coerce the defendant into granting consent."[17]

As to the first step under this two-part test, Defendant raises the issue of the language barrier between himself and the officer.  After having reviewed the tape of the traffic stop and observing Defendant while testifying at the suppression hearing, the Court finds that Defendant understands English well enough to understand most of what Sgt. Mangelson was saying to him during the stop.  On the tape Defendant responds appropriately to Sgt. Mangelson's questions and follows the officer's directions.  Therefore, the Court finds that Defendant speaks English well enough to voluntarily give consent and that he gave such consent.[18]  The Court finds that Defendant's consent was unequivocal and specific and was freely and intelligently given.

As to the second issue, Defendant, in his reply brief, argues that his consent to search the trunk may have been given under coercion because the stop was effectuated through a demonstration of authority.[19]  In determining whether a consent to search was free from coercion the "court should consider, *inter alia*, physical mistreatment, use of violence, threats, threats of

---

[16]*Id*. (quoting *United States v. Agulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).

[17]*Id*.

[18]*See United States v. Sanchez-Valderuten*, 11 F.3d 985, 990–91 (10th Cir. 1993) (finding adequate "receptive English language skills" to consent to search, despite defendant's difficulty in speaking English); *United States v. Corral*, 899 F.2d 991, 994 (10th Cir. 1990) (defendant with limited knowledge of English voluntarily consented because he understood the officer's questions, answered questions in English and demonstrated an overall working knowledge of English).

[19]The Court would note that Defendant, in his Motion, conceded that the search of the trunk was lawful.  Despite this, the Court will address whether the consent to search the trunk was voluntarily given.

violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances."[20]  "An officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'"[21]

Defendant does not assert that Sgt. Mangelson used any of these tactics.  Rather, Defendant specifically cites to the flashing lights and the officer's uniform as forms of coercion.  The Court finds that Defendant's consent was not given as a result of coercion.  Sgt. Mangelson did not draw his weapon, did not touch Defendant, nor did he raise his voice during the encounter, he made no promises or inducements, and did not engage in trickery or deception.  There is simply nothing to indicate that Defendant was coerced into giving his consent.  Thus, based on the totality of the circumstances, the Court finds that Defendant's consent was freely and intelligently given, and that it was not obtained by coercion.

        b.     SCOPE OF CONSENT

"The scope of consent is a fact question based upon what a reasonable person would have understood under the circumstances."[22]  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical person have understood by the exchange between the officer and the suspect?"[23]  "The

---

[20] *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994).

[21] *Id.* (quoting *United States v. Griffin*, 7 F.3d 1512, 1517 (10th Cir. 1993)).

[22] *United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005).

[23] *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

scope of a search is generally defined by its expressed object"[24] and "is limited by the breadth of the consent given."[25] The question, then, is whether a reasonable person under the circumstances would have concluded, based on the interaction between Sgt. Mangelson and the Defendant, that Defendant had consented to a search of the entire vehicle, including the trunk, passenger compartment, and the hood area.

The Tenth Circuit has "consistently and repeatedly . . . held [that] a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."[26] In addition, a number of cases stand for the proposition that a defendant's actions may show that consent was given.[27]

In this case, Sgt. Mangelson asked if there were any drugs ("drogas") or weapons ("pistolas") in the car. Defendant responded that there were not. From this encounter, a typical reasonable person would conclude that the officer was interested in searching for these two items. The officer then asked Defendant if he could search the vehicle. The officer testified that he believed that he was given permission to search the vehicle and the video tape of the stop

---

[24]*Id.*

[25]*United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (citation omitted).

[26]*United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999).

[27]*See United States v. Gigley*, 213 F.3d 509, 515 (10th Cir. 2000) (defendant's actions of removing dog and leaving van doors open showed that she consented to search); *United States v. Flores*, 48 F.3d 467, 469 (10th Cir. 1995) (consent to continue search found where defendant said nothing, but opened trunk for officer); *United States v. Benitez*, 899 F.2d 995, 998 (10th Cir. 1990) (voluntariness of consent found where defendant, in response to requests to search trunk and suitcases, opened the items himself but said nothing).

bears this out. The officer then stated "cajuela" and pointed to the trunk. At that point, Defendant said "yeah," and got out of the vehicle to open the trunk. After searching through the trunk and its contents, the officer proceeded to search the interior compartment of the vehicle. Defendant did not object to this and did not try to limit the officer's search. The officer then proceeded to the front of the car. Defendant did not object to this. In fact, when the officer was unable to open the hood right away, Defendant approached the officer and opened the hood for him. At no point during this encounter did Defendant attempt to limit the search. There was no objection from Defendant when the officer moved from the trunk to the interior of the vehicle and Defendant even helped the officer move from the interior to the hood area.

      The Court finds that Defendant gave the officer general consent to search the vehicle. The Court finds that the cases cited by the government are instructive on this issue. In those cases, as here, the officers sought and received a general consent to search the entire vehicle. For example, in *Flores*, the officer asked permission to search the entire vehicle and the defendant opened the trunk.[28] After an initial search of the trunk, the defendant closed it, but later reopened it at the officer's request.[29] The court held that the defendant's act of reopening the trunk indicated her consent to resume the search.[30] In *Gigley*, the officer asked the defendant if he could look in the van.[31] Defendant said yes, then removed her dog and left the van's doors

---

[28] 48 F.3d at 469.

[29] *Id*.

[30] *Id*.

[31] 213 F.3d at 514.

open.[32]  By taking these actions, the court found that the defendant "signaled that the search was within the scope of her consent."[33]  Likewise in *Benitez*, the officer asked to search the trunk and the suitcases and the defendant immediately opened the trunk and unzipped the suitcases.[34]

Like these cases, Defendant gave the officer permission to search the entire vehicle. Defendant did not object as the officer searched the trunk, did not object when the officer searched the interior of the vehicle, and did not object when the officer searched under the hood. Defendant even went so far as to open the hood of the car when the officer was unable to do so. Therefore, the Court finds that Defendant consented to a search of the entire vehicle; that Defendant did not limit that search; and that the officer's search did not unlawfully expand the scope of the consent given.  This is especially true with regard to the trunk and the engine areas of the vehicle, where Defendant assisted the officer by opening these areas.  Therefore, the Court finds, based on the totality of the circumstances, that Defendant voluntarily consented to the search of the entire vehicle, especially the trunk and the hood area.

    2.    PROBABLE CAUSE

The Court further finds that even if Defendant had limited the scope of the consent given, the officer had probable cause to search the entire vehicle, including the air bag compartment. "A police officer may conduct a warrantless search of an automobile if there is 'probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under

---

[32]*Id*. at 515.

[33]*Id*.

[34]889 F.2d at 998.

law.'"[35]  "In determining whether probable cause exists, an officer 'may draw inferences based on his own experience.'"[36]  "It is well established that evidence of a hidden compartment can contribute to probable cause to search."[37]  The Tenth Circuit has set out a two-part test to determine whether probable cause to search a vehicle can be based on evidence of a hidden compartment: (1) the probative value of the evidence—that is, the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband.[38]

When Sgt. Mangelson first approached the vehicle, the passenger opened the door, rather than rolling down the window.  The officer testified that he had encountered situations where drugs were hidden in vehicle doors making the window inoperable.  The officer also testified that Defendant and the passenger appeared nervous, more nervous than usual, and that their nervousness did not lessen over time.  Sgt. Mangelson also testified that he saw blankets, similar to a type in which he had seen drugs on previous occasions.  The officer also saw food and drink wrappers, which gave the vehicle a "lived in" look.  The officer also noticed certain items which, based on his experience, were religious "disclaimers."  The officer observed a cell phone and a screw driver, both of which were items that the officer had seen in vehicles where drugs were

---

[35]*United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1261 (10th Cir. 2006) (quoting *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002) (internal quotation marks omitted)).

[36]*Mercado*, 307 F.3d at 1230 (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)).

[37]*Id*.

[38]*United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004).

being smuggled. Moreover, the vehicle was registered to a third party, neither Defendant nor the passenger had a valid operator's license, and Defendant was traveling from a state known as a narcotic source.

When the officer examined the engine compartment of the vehicle, Defendant removed electrical tape from the area. Sgt. Mangelson testified that electrical tape is often used to wrap drugs and to wrap wiring, including wiring involved with solenoids. The officer also saw fresh weld marks near the air bag compartment. Based on his experience, the officer could reasonably conclude that there was a secret compartment and that the compartment contained contraband. As a result of all of these things, the officer had probable cause to believe that there was contraband in the air bag compartment and could lawfully search that area. Therefore, Defendant's Motion to Suppress will be denied.

B.    INVENTORY SEARCH AND INEVITABLE DISCOVERY

As noted above, since the Court finds that Defendant consented to the search of the vehicle and that the officer had probable cause to search the air bag compartment, the Court will not address the government's final argument under the inevitable discovery doctrine.

### III.  CONCLUSION

It is therefore

ORDERED that Defendant's Motion to Suppress Evidence (Docket Nos. 11 and 20) is DENIED. It is further

ORDERED that the time from the filing of the Motion to Suppress—January 12, 2006—through the new trial date to be established by the Court, is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).

DATED   June 21, 2006.

BY THE COURT:

_____
TED STEWART
United States District Judge